7-1-7-7-8 United States v. Alberto Sostre-Cintron Good morning, your honors. My name is attorney Michael Hasse, and I represent Alberto Sostre-Cintron. And to this day, Mr. Sostre-Cintron is perplexed why he didn't receive Social Security and why he was put in jail for following his doctor's orders. And looking through the trial transcript and what was eventually done with Mr. Cintron, one can't wonder why this prosecution wasn't set up the way it was. I mean, the doctor here was obviously the person with the vast amount of knowledge in Social Security, and he was a vast force in what Alberto Sostre-Cintron did. He did what his doctor said to do, and at the beginning, I mean, of course, with no defendant testimony, it's difficult to know what's exactly going on in the defendant's mind. And it's also easy to make insinuations about what you see him doing, but if you look at everything and you see what happens by him following what his doctor said, following what the doctor put into the initial report to Social Security, it is difficult to see why Sostre-Cintron was prosecuted and not used as a cooperating witness against the doctor. However, it went as it was, and I can see that there was a plot to unlawfully receive Social Security's benefits. But whose plot was it is really the thrust of my argument. Was it Dr. Escabi's plot? It doesn't seem from the reading of the trial transcript that Sostre-Cintron went to Dr. Escabi Perez because Escabi Perez had a lot of ways of getting Social Security benefits. He went there seeking treatment. When he went there seeking treatment, you know, every doctor has their own methodology of treating patients. If the defendant had shown that he was aware, would that support your argument? That would tend to defeat my argument if that was the way at the outset. If you look at the evidence in the case and the notes that I looked at, particularly the doctor's notes, and that was probably why the prosecution was to pick Dr. Escabi as the cooperator because, to be honest with you, reading through his doctor's notes, I couldn't read what they said if I didn't look at the translations which showed the doctor's notes in crystal clear typewritten language what they exactly said. It would be very difficult without help from a cooperating witness to decipher the doctor's notes. Many doctors write this way. It's true. Your fellow told the SSA he was not working when he was. He was working his side job. Right. He said he was. That's correct. Isn't that called fraud? At the direction of his doctor. Well, if the doctor told him to rob a bank, would he get off the hook? He would not. But if the doctor told him to lie to the SSA, does he get off the hook? If a professional goes in and says, here's what we put on our initial report, here's what I put down for you, follow it. There is some, I'm not saying it's right, but I mean it could be a legal excuse to say something in the direction of following your doctor's orders. And it wasn't just the form, was it? Weren't you interviewed by the SSA when you applied for? Yeah, there was an interview with a telephone actually a relative took over the interview halfway through its conduction. One of the questions in that interview is are you doing any work which you're being paid? That is correct. And he lied. And he did not tell the truth in that question. But he had also been provided a script from Dr. Ascabi as to exactly what to say. Also, the evidence of payment by the defendant. There was a $500 payment made, but no $4,000 payment. There was a $4,000 written in the doctor's notes apparently what Dr. Ascabi planned to get out of the case. But that payment was never made. And the government also indicated that a Rule 29 motion was waived, the theft of government property. And if the review of the transcript, particularly on page 57 of day five of the transcripts, that's not what the government thought at the time of trial. The government at the time of trial articulated a response to the Rule 29 motion, which was that the government failed to meet all the elements of the charges. So I think that the Rule 29 motion did properly address the theft of government account. Also, there was much ado made of the testimony made in the bankruptcy court as to Alberto Sastre's introns, culpability in the case. And there's really different standards in bankruptcy court as to your answers and what is acceptable and what is really a lie or what means something or what doesn't mean something. If somebody gives an answer in the bankruptcy court, there's a homestead exemption for an individual of $23,675. If somebody names anything between zero and $23,675 for their homestead exemption, it really is of no moment to the proceedings because it's an answer that's within the range of what the exemption is. So it's really the bankruptcy stuff is a little bit suspect in terms of applying that to evidence of the man's continuing working. The evidence that was given against Dr. Escovia, other than the neighbor, was all really law enforcement and social security, regulation enforcement, special agents, and people that were involved heavily in the social security enforcement process. Dr. Escovia Perez, from his resume of experience, and obviously what he did in terms of his, he articulated what he did in his testimony, he was a driving force here. Dr. Escovia, there was no evidence given that Dr. Escovia went there with the mindset of creating a fraud or giving himself evidence that was not appropriate. Dr. Escovia was the person that was supposed to make his medical reports. He was the one that was evaluating them. It doesn't ever say in the transcript that Dr. Escovia performed this test, that test, that test. Even though he failed these tests, I put down a different answer. The questions to him were, did you perceive these difficulties? And he talked even about the medication, the PROZAC. Counsel, I thought the jury had evidence that he went to the doctor something like four times between September and November of 2010, and then submitted a claim in which he said he went 21 times to the doctor starting in 2009. Isn't that enough for a jury to conclude that he must have been aware of the untruthfulness of that statement? That is a good point, but contrary to that, again, he was following the advising plan laid out by his doctors. There was a similar Connecticut case where a chiropractor saw a person twice, put down 20 visits for purposes of a lawyer's auto accident claims. Well, the lawyer and the chiropractor are in jail now, and the people that went to this pair that had this fraud going were all the cooperating witnesses that brought down the fraudulent scheme, which was orchestrated by the doctor and the chiropractor. I mean, it was seen here that all these people that went to see Dr. Escovia Perez, and there were hundreds of them. It seemed to him that the more appropriate approach and the more appropriate disposition in the end, in terms of what sanctions people were to get, would be for the doctor to take the hit and to receive the punishment under the law and not the individual patient. It's kind of like bringing an indictment against a drug conspiracy and then putting all the end users in jail and giving the head of the conspiracy the ticket to ride. It's not an appropriate disposition in terms of the 3553A factors. That wasn't factored in in terms of the sentence that was pronounced. In terms of the role in the offense, I think Alberto Sastre-Cintron had a minimal role as opposed to Dr. Escovia Perez's orchestrated maximum role in creating this. And it's bolstered, although not within the four corners of this appeal, by the number of other people that were brought into prosecution under this conspiracy. And there were others. Each case was unique to its facts. Not one of these cases identical to the other because each people had different ailments and different disabilities and different stages of disabilities. But Dr. Escobia set the stage. He interpreted the data. He created the plot. And he instructed Sastre-Cintron, as his position, exactly what to follow in terms of his reports to the Social Security Administration. Thank you. Good morning, and may it please the Court. Assistant United States Attorney Catherine DeBrasan for the United States. Your Honors, this case is about a man and a doctor defrauding the government. This Court should affirm the District Court's ruling and the sentence for three reasons. First, because there was sufficient evidence presented at trial that Sastre did intend and knowingly conspire to defraud the government. Second, because Count 3 was waived because it wasn't raised in the District Court. And third, because the District Court's sentence was adequate to the crime and the District Court considered all relevant 3553A factors and adequately explained its sentence. So before we discuss Count 1, I'd like to mention in response to Counsel's Count 3 argument that it wasn't waived, that just because AUSA IRB responded both for Count 1 and Count 3, does not mean that that was properly raised in Rule 29. And if you look on page 57 of the trial transcript for Day 5, the Rule 29 motion says, We request that the charges pending against Sastre-Cintron be dismissed since the basic elements of the offense of conspiracy have not been met. It does not say anything about the Count 3 theft of government property. So I just wanted to clarify that for the record. So here we have not only the direct evidence of Dr. Ascave's testimony about the agreement, where he said that Sastre paid $500 for the false psychiatric report and agreed to pay $4,000 for the backdating, but we also have specific actions by Sastre-Cintron. Dr. Ascave's testimony alone would be sufficient, and it's corroborated by his secretary, Ayala, who said after Sastre left the appointment with Dr. Ascave, she talked to him and he said, Yes, I paid $5,000 for the false psychiatric report and I agreed to pay $500 for the false psychiatric report and I agreed to pay $4,000 for the backdate. But then we also have Sastre's actions, as you discussed with the poison counsel, about reporting work. And there is no discrepancy as to the fact that Sastre was the one that inaccurately reported work to the Social Security Administration. On the interview in Section 4, Juliet, the interviewer, says that those words were specifically said by Sastre. There's no dispute about that. And if there is any dispute, the aunt was speaking on his behalf and he is accountable for her statements. So just the fact that Dr. Ascave said, We agreed, and he paid him for an entire agreement, is sufficient under Corte Escrivá. Then we have the work that he inaccurately reported, despite the fact that he was reporting to the bankruptcy court, that he was working, and also it's reported by a cashier that he was working. So that alone is sufficient for Social Security fraud. But we also have so much more in this case. We have the limitations that were reported in the adult functions report, which are not highly technical medical limitations. He reported, I can't eat food without supervision, I can't bathe without supervision. So we have all of those things, plus the fact that he paid and he knew he had a duty to tell the truth because of the warnings given on the phone interview. So because of that, there is sufficient evidence that Sastry knowingly participated in the submission of false statements in order to obtain Social Security disability benefits that he knew he was not entitled to. Sastry knew he was committing Social Security fraud with Dr. Ascave, but still chose to lie in his initial application and then fraudulently collect disability payments for three and a half years. Sastry was the one who benefited, receiving almost $100,000. Accordingly, the district court's denial of Sastry's Rule 21 motion for count one was proper. The United States presented sufficient evidence to support this charge. If your honors have no further questions, I will yield my time and rest on my briefs. All right, thank you. Thank you.